378 F.3d 133
 MAKE THE ROAD BY WALKING, INC., Plaintiff-Appellant,
Irania Sanchez and Emilio Vega, on behalf of themselves and all others similarly situated, Plaintiffs,
v.
Jason A. TURNER, as Administrator of the Human Resources Administration of the City of New York, Defendant-Appellee.
 Docket No. 02-7876.
 United States Court of Appeals, Second Circuit.
 Argued: April 7, 2003.
 Decided: August 4, 2004.
 
 Appeal from the United States District Court for the Southern District of New York, Allen G. Schwartz, J. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Laura K. Abel (David S. Udell, on the brief), Brennan Center for Justice, New York, New York (Constance P. Carden and Laura Davis, New York Legal Assistance Group, New York, New York, Thomas McGanney and David Hille, White & Case LLP, New York, New York, Marc Cohan, Rebecca Scharf, Welfare Law Center, New York, New York, on the brief), for Plaintiff-Appellant.
 Elizabeth I. Freedman, Assistant Corporation Counsel of the City of New York (Michael A. Cardozo, Corporation Counsel of the City of New York, and Leonard Koerner and Janice Birnbaum, Assistant Corporation Counsel of the City of New York, on the brief), Corporation Counsel's Office, New York, New York, for Defendant-Appellee.
 Before: WALKER, Chief Judge, OAKES, and WINTER, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Make the Road by Walking ("MRBW") appeals from Judge Schwartz's grant of summary judgment to the Human Resources Administration ("HRA"). The district court held that exclusion of MRBW from welfare office waiting rooms (sometimes "Job Center waiting rooms") when MRBW was not there to transact "official business" did not violate appellant's First Amendment, due process, or equal protection rights. Judge Schwartz also granted summary judgment to MRBW on its claim that a portion of the HRA policy on admission to Job Center waiting rooms was unconstitutionally vague. MRBW appeals from only the district court's First Amendment ruling; HRA does not cross-appeal.
 
 
 2
 The dispositive issue is whether the Job Center waiting rooms are nonpublic fora or limited public fora for First Amendment purposes. We hold that the waiting rooms are nonpublic fora and that the exclusion of MRBW was reasonable and viewpoint neutral. We therefore affirm, albeit on grounds different from those expressed by the district court.
 
 BACKGROUND
 
 3
 MRBW is an advocacy organization incorporated in 1998 and located in Bushwick, Brooklyn. It seeks to provide "information, assistance, and representation with respect to public assistance benefits" to welfare claimants in Job Centers. Specifically, MRBW advocates inform claimants of their rights, help them complete application and recertification forms, translate for non-English-speaking claimants, and represent individual claimants during meetings with caseworkers. In addition, advocates may "quickly encourage Welfare Center personnel to follow proper procedures so that erroneous decisions are not made" and can "remain on site to address any remaining ambiguities or resistance by the Welfare Center employees." In the long run, according to MRBW, advocates "can observe and identify chronic or systemic problems and request that HRA employees rectify those problems."
 
 
 4
 MRBW is staffed by lawyers and non-lawyers, and its members are community residents who volunteer for four hours or pay dues of two dollars each month. MRBW employs four full time attorneys, one law school graduate, and four staff organizers. One lawyer is assigned to the project responsible for the MRBW programs at issue in this case, the Equal Justice Project ("EJP"). The parties dispute whether the two non-lawyer EJP staff advocates — out of the three EJP advocates in all — are trained for their jobs. HRA claims that one of the two non-lawyers has received no training, while the other has attended only a day-long seminar about benefits. MRBW responds that advocates perform only those tasks for which they have been trained, and that this training consists of discussions at meetings, one-on-one conversations, role-playing, and practicing. MRBW has successfully advocated for numerous welfare claimants, mainly by filing complaints with HRA.
 
 
 5
 The Job Center waiting rooms are operated by HRA, the social services district charged with administering and dispensing benefits to residents of New York City. The Family Independence Administration ("FIA") is the largest division of HRA and administers many welfare benefits programs, including public assistance (cash subsidies to recipients), Medicaid, and food stamps. Claimants apply for these benefits or are recertified to receive them at Job Centers, which are operated by FIA, except that claimants who are eligible only for Medicaid are referred to another division of HRA. FIA is solely responsible for operating Job Center waiting rooms.
 
 
 6
 Each Job Center has a waiting room, and each also has separate areas containing "cubicles of eligibility specialists and financial planners" who interview and process forms for claimants. The business serving claimants at Job Centers takes place mainly in these separate areas; the parties agree that the purpose of providing waiting room access to claimants is "to facilitate the Claimants' business with FIA."
 
 
 7
 In debating whether the Job Centers are limited public or nonpublic fora, the parties have looked to HRA policies from the 1970s to the present date. During this period, federal and state law have required HRA to allow claimants to select and bring an advocate into Job Centers. 45 C.F.R. § 206.10(a)(1)(iii); 18 N.Y. Comp.Codes R. & Reg. tit. 18, § 351.1(d). While accompanying a claimant to a Job Center, an advocate can inform, assist, and represent that claimant, and can help other claimants who ask for the advocate's assistance. However, retained advocates may not solicit new clients in Job Center waiting rooms. Advocates brought by claimants need not have prior permission or training, or meet any other criteria to gain entry. Id.
 
 
 8
 In 1974, we held that the Albany welfare office could not totally prohibit peaceful leafletting about, and discussion of, the legal rights of welfare recipients and the welfare rights movement in welfare office waiting rooms by advocacy groups. Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319, 1322 (2d Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). We indicated that the waiting rooms were not traditional public fora but that some expression was permissible. Id. at 1324. In light of this decision, from 1974 through approximately 1991, HRA allowed unretained advocates to enter Job Centers and provide information, representation, and assistance to claimants. New York City Unemployed & Welfare Council v. Brezenoff, 677 F.2d 232, 235 (2d Cir.1982) (describing access policy). In 1977, HRA promulgated regulations allowing "[o]rganizations desiring to converse with clients and distribute literature" to sit at tables in Job Centers, id.; such "Community Tables" were referred to in the HRA Procedure Manual as late as 1983. After the district court decision in Brezenoff struck down regulations requiring advocates to stay behind tables, HRA also began allowing one advocate from any group present in a Job Center to walk around the waiting room. Id. at 235 n. 4.
 
 
 9
 Several advocacy organizations took advantage of this access to Job Centers. During the 1970s, HRA admitted the Food Law Project; in the 1980s, it admitted the New York City Unemployed and Welfare Council; and in the late 1980s and early 1990s, HRA admitted other advocates. Id. at 234; id. at 241 (Murphy, J., concurring in part and dissenting in part).
 
 
 10
 In 1985, the Supreme Court decided Cornelius v. NAACP Legal Defense and Educational Fund, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and in 1992 it decided International Society for Krishna Consciousness, Inc. v. Lee (Lee I), 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). These cases built upon the tripartite forum analysis developed in Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and clarified that a designated public forum, including a limited public forum, arises only where the government intends to create one. Lee I, 505 U.S. at 680, 112 S.Ct. 2701; Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. This reliance upon governmental intent substantially differed from the analysis used in Albany Welfare and Brezenoff, and, beginning in the early 1990s, HRA began enforcing a policy first enacted in its Code of Conduct in 1974, and included in each subsequent Code of Conduct, that was at odds with Albany Welfare and Brezenoff. That policy provided that
 
 
 11
 The Use of [HRA] Premises shall be limited to the transaction of official business and such other activities as may be specifically authorized by the HRA/ [Department of Social Services] Administrator/Commissioner.... Distribution of written material on Agency premises is limited to releases issued or sponsored by [HRA], releases of recognized staff organizations or clubs approved for distribution by [HRA] ... and releases of certified labor organizations pursuant to collective bargaining agreements.
 
 
 12
 HRA Code of Conduct.[1] According to HRA, its official business "is delineated by federal and state law, as well as local law," and, under this policy, HRA limits "third party access to Centers and their waiting rooms to those individuals who are part of the transaction of HRA's official business." In recent years, retained advocates, contractors providing managed health care and homelessness intervention services, the U.S. Census Bureau, and the New York State Department of Health have been admitted under this policy. These entities, except for the homelessness intervention contractors, may deal with claimants in the Job Center waiting rooms. Academics and government officials also occasionally tour the Job Centers by permission. The managed care and homelessness intervention contractors operate in Job Centers pursuant to contracts with HRA requiring compliance with anti-discrimination laws and indemnification of the City for any liability arising from their services, as well as insurance coverage of $1,000,000 per occurrence. HRA contracts with these providers pursuant to federal and state law. N.Y. Soc. Servs. Law §§ 364-j, 365, 369-ee (managed care); N.Y. Pub. Health Law §§ 2510 et seq., 2520 (managed care for pregnant women and children); N.Y. Soc. Servs. Law §§ 48-50 (homelessness intervention). See also note 2, infra.
 
 
 13
 Members of the general public can enter Welfare Centers freely, in the sense that anyone can walk in from the street to a welfare office waiting room. However, three to four times a day Job Center supervisors "patrol the Center waiting rooms to ensure that everyone is being properly served and that people are not waiting too long." These supervisors also ask those in the waiting rooms for the purpose of their visit, and those who are not there to conduct official business are asked to leave. Claimants may bring friends, relatives, and retained advocates to Job Centers. Unless already retained by a claimant, MRBW's representatives are no longer allowed to enter Job Centers because they lack authorization under the "official business" policy. On August 19, 1998, MRBW, along with the Brennan Center for Justice, the Legal Aid Society, the New York Legal Assistance Group and the Welfare Law Center, requested access to the Job Center waiting rooms to assist, inform, and represent claimants. The City's counsel responded in a letter, stating that "HRA declines to grant the access you seek in your letter, other than for the purpose of providing representation to a specific applicant or recipient, in accordance with 18 N.Y.C.R.R. § 351.1(d)."
 
 
 14
 This suit seeking access to Job Center waiting rooms followed. MRBW's complaint claimed that HRA's access policy violated the First and Fourteenth Amendments of the U.S. Constitution because it was vague, constituted viewpoint discrimination, and abridged MRBW's speech, press, petition, and associational rights. MRBW also argued that the policy violated the plaintiff welfare claimants' due process and equal protection rights. Both parties moved for summary judgment.
 
 
 15
 After entertaining cross-motions for summary judgment, the district court granted each party's motion in part. It held that the portion of HRA's access policy allowing entry for "other such activities as may be specifically authorized" by the HRA Administrator, as well as the portion allowing distribution of literature "issued or sponsored" by HRA, to be unconstitutionally vague. Sanchez v. Turner, No. 00 Civ. 1674(AGS), 2002 U.S. Dist. LEXIS 10911, at *15-16, *23-24, 2002 WL 1343754, at *5 (S.D.N.Y. June 19, 2002). The court severed those clauses and left the remainder of the policy standing. Id. HRA has not appealed from this part of the district court's decision.
 
 
 16
 The court also granted HRA's motion for summary judgment in part, on two First Amendment grounds. First, the court determined that limiting the use of HRA premises to "official business" was not unconstitutionally vague because "HRA's official business is clearly defined by state and local law," specifically the New York Social Services Law, the New York City Charter, and state regulations. Id. at *17, 2002 WL 1343754, at *5. Furthermore, according to the court, HRA's inclusion of contractors — Medicaid providers and homelessness intervention services — as well as advocates previously retained by claimants, the New York State Department of Health, the U.S. Census Bureau, and academic tours, did not demonstrate that HRA had unfettered discretion in determining what constituted official business. Id. at *18-21, 2002 WL 1343754, at *5. Rather, each of these entities conducted official business pursuant to the New York City Charter or the City regulations.[2]
 
 
 17
 The district court pointed out that "New York's Social Services Law establishes New York City as a `social services district' and requires that each social services district `shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.' NY Soc. Serv. § 62(1); see also N.Y. Soc. Serv. § 56. Under the New York City Charter, HRA (referred to in the Charter as the Department of Social Services) is the mayoral agency charged with upholding the City's responsibilities under the social services law. See NYC Charter §§ 601-604." Sanchez v. Turner 2002 U.S. Dist. LEXIS 10911, at *17, 2002 WL 1343754 at *4.
 
 
 18
 Second, the court held that the Job Center waiting rooms were "public fora for the purposes of speech pertaining to welfare issues" and that in `limited public fora' restrictions on speech need only be "reasonable and viewpoint neutral." Id. at *26-27, 2002 WL 1343754, at *7. According to the court, HRA policies satisfied this requirement and were therefore constitutional. The court reasoned that HRA's "interest is legitimate and its method for achieving that interest is reasonable" and that "it is not the Court's role to second guess the City and determine whether HRA's policy represents the least restrictive means for achieving HRA's interest." Id. at *32, 2002 WL 1343754, at *7. Specifically, the court held that the policy was a reasonable way to accomplish HRA's interest in limiting congestion and disruption in Job Centers and in preventing confusion on the part of claimants who might believe that HRA endorsed statements made by non-official groups. Id. at *28-32, 2002 WL 1343754, at *8. According to the court, HRA's policy was viewpoint neutral because it was not "an effort to suppress the speaker's activity due to disagreement with the speaker's point of view." Id. at *33, 2002 WL 1343754, at *8 (internal citation and quotation omitted).[3] MRBW's appeal followed.
 
 DISCUSSION
 
 19
 We review a district court's grant of summary judgment de novo, "drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party." Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc., 295 F.3d 256, 260 (2d Cir.2002). When considering cross-motions for summary judgment, a court "`must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Hotel Employees & Rest. Employees Union Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation ("HERE"), 311 F.3d 534, 543 (2d Cir.2002) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.1993)). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 20
 HRA does not contest the fact that MRBW wants to engage in speech protected by the First Amendment. However, notwithstanding that "[f]reedom of expression ... is a fundamental right, essential to our democratic society and accorded great weight by our courts," Brezenoff, 677 F.2d at 236 (citing De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937); NAACP v. Button, 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)), "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities," Cornelius, 473 U.S. at 799-800, 105 S.Ct. 3439. Restrictions on expression on government property are generally subject to heightened scrutiny. Perry, 460 U.S. at 45, 103 S.Ct. 948.
 
 
 21
 a) Forum Analysis
 
 
 22
 The appropriate level of judicial scrutiny depends on the nature of the forum subject to the regulation. The Supreme Court has recognized three types of fora across a spectrum of constitutional protection for expressive activity. "Traditional public fora" are places such as "streets and parks which `have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45, 103 S.Ct. 948 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). Speech finds its greatest protection in traditional public fora, and government may not alter their public status without completely changing the fora's use, e.g. converting a public park to an office building. In public fora, content-neutral time, place, and manner regulations of speech must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. Id.; see also Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991). Content-based restrictions will be upheld only if they are "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." Perry, 460 U.S. at 45, 103 S.Ct. 948 (citing Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)).
 
 
 23
 Next on the spectrum is the "designated public forum," "a place not traditionally open to assembly and debate," Cornelius, 473 U.S. at 802, 105 S.Ct. 3439, "which the State has opened for use by the public as a place for expressive activity," Perry, 460 U.S. at 45, 103 S.Ct. 948. "`The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse.'" Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. 3439) (modification in Ark. Educ. Television Comm'n). Furthermore, the government may decide to close a designated public forum. Perry, 460 U.S. at 46, 103 S.Ct. 948 (stating that government "is not required to indefinitely retain the open character of" a designated public forum). However, so long as a forum remains public, government regulation of speech within it "is subject to the same limitations as that governing a traditional public forum," Lee I, 505 U.S. at 678, 112 S.Ct. 2701.
 
 
 24
 The limited public forum is a subset of the designated public forum. It arises "`where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" HERE, 311 F.3d at 545 (quoting N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 n. 2 (2d Cir.), cert. denied, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998)). Restrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral. See, e.g., Fighting Finest v. Bratton, 95 F.3d 224, 227 (2d Cir.1996) (corrected opinion).[4]
 
 
 25
 Finally, "nonpublic forum" is public property not traditionally open to public expression or intentionally designated by the government as a place for such expression. General Media Communs. v. Cohen, 131 F.3d 273, 275 (2d Cir.1997) (corrected opinion) ("all remaining public property" that is not traditional or designated public forum is nonpublic forum). Restrictions on speech in a nonpublic forum need only be reasonable and viewpoint neutral. Lee I, 505 U.S. at 679, 112 S.Ct. 2701. "[T]he State may reserve [a nonpublic forum] for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. 948.
 
 
 26
 b) The Distinction Between Limited Public and Nonpublic Fora
 
 
 27
 Governmental intent is the "touchstone of forum analysis," General Media, 131 F.3d 273, 278 (internal quotations omitted), for determining whether property is a limited public or nonpublic forum. Courts have "looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," Cornelius, 473 U.S. at 802, 105 S.Ct. 3439, as well as to the "nature of the property, and its compatibility with expressive activity," General Media, at 278. See also Perry v. McDonald, 280 F.3d 159, 167 (2d Cir.2001) (stating forum analysis factors). If these indicia show that intent to create a public forum is absent, the forum is generally nonpublic.[5] Of course, the fact that "`members of the public are permitted freely to visit'" a forum — such as the airport terminals held nonpublic in Lee I — does not abrogate its nonpublic status if the visitors are not permitted to express themselves freely in that forum. Lee I, 505 U.S. at 680, 112 S.Ct. 2701 (quoting Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)).
 
 
 28
 Also, a policy allowing some speakers to use a forum does not necessarily convert a nonpublic forum into a limited public forum. A public forum "is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." Ark. Educ. Television Comm'n, 523 U.S. at 679, 118 S.Ct. 1633. See also Fighting Finest, at 228 (some access to forum does not render it public). There is a
 
 
 29
 distinction between "general access," which indicates the property is a designated public forum, and "selective access," which indicates the property is a nonpublic forum. On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers.... On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," to use it. For instance, the Federal Government did not create a designated public forum in Cornelius when it reserved eligibility for participation in [a fundraising drive aimed at federal employees] to charitable agencies, and then made individual, non-ministerial judgments as to which of the eligible agencies would participate.
 
 
 30
 The Cornelius distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.
 
 
 31
 Ark. Educ. Television Comm'n, 523 U.S. at 679-80, 118 S.Ct. 1633 (internal citations omitted). Whether the access policy is selective or general is determined by reference to written policies and actual practice. See Lebron v. Nat'l R.R. Passenger Corp. (AMTRAK), 69 F.3d 650, 656 (2d Cir.1995) (noting that "a court must examine the actual policy — as gleaned from the consistent practice with regard to various speakers — to determine whether a state intended to create a designated public forum") (internal quotation omitted).
 
 
 32
 The distinction between selective and general access policies applies with equal force when the limited public forum is open only to the discussion of certain topics rather than to certain speakers. On the one hand, when a forum is generally available for the discussion of certain topics, it is a limited public forum. On the other hand, when the government "reserves eligibility for access" to particular topical discussions, but those who wish to gain entrance must individually seek permission to use the forum, it is nonpublic. For example, in determining that a military base was a nonpublic forum, the Supreme Court noted that
 
 
 33
 [t]he fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum.... The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.
 
 
 34
 Greer, 424 U.S. at 838 n. 10, 96 S.Ct. 1211. Eligibility for entrance to express oneself in Fort Dix was therefore validly limited to those discussing topics that furthered the "military mission" of the base, and then to only those potential speakers who were allowed access on an individual basis.
 
 
 35
 As indicia of governmental intent, the purposes of access limits can also be important in determining a forum's status. Where the government's goal in granting selective access to a forum is to further its own internal objectives, a forum is more likely to be nonpublic.[6]
 
 
 36
 Finally, the physical characteristics of a forum can help determine whether it is public or nonpublic. Courts will not "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." Cornelius, 473 U.S. at 803, 105 S.Ct. 3439. The location of a forum may be evidence of its status; "separation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction." Lee I, 505 U.S. at 680, 112 S.Ct. 2701 (citing United States v. Grace, 461 U.S. 171, 179-80, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).
 
 
 37
 c) Application
 
 
 38
 Applying the forum analysis outlined above, the Job Center waiting rooms must be categorized as nonpublic forums. HRA unequivocally evidenced its intent to render them nonpublic by enforcing a written policy reserving them for "official business" or for activities "specifically authorized" by the Administrator. Neither the "official business" nor the "specifically authorized" language evidences an intent to open the Job Centers to the public. Nor is there evidence that the "specifically authorized" clause has ever been used to allow anyone without official business to enter the Job Centers or their waiting rooms for expressive purposes,[7] and that clause has now been excised by the district court's order, an act from which HRA has not appealed.[8]
 
 
 39
 Like waiting rooms in airport terminals, medical clinics or doctor's offices, or motor vehicle departments, welfare office waiting rooms generate casual conversations. Such conversations may involve family matters, the weather, sports, politics, or many other subjects, including welfare policies or particular welfare applications. While this expressive activity may take place, it is entirely incidental to the purpose of the welfare office waiting rooms, namely to ensure an orderly flow of claimants to the interviewers.
 
 
 40
 Welfare advocacy organizations had access to welfare office waiting rooms between 1974 and approximately 1991. However, this prior access does not undermine our conclusion because it was compelled by our decisions in Albany Welfare and Brezenoff and was not a policy freely chosen by HRA. Those cases essentially held that the waiting rooms were limited public fora open to discussion of welfare issues by virtue of the fact that welfare recipients waited in them. No consideration was given to government intent. As discussed above, the Supreme Court has since then held in Cornelius and Lee I that governmental intent and access policy, as well as the purpose of a forum, are the touchstones for differentiating between designated public fora and nonpublic fora. In the aftermath of those decisions, HRA began to enforce its Code of Conduct disallowing all but "official business" and thereby demonstrated a clear intent to convert the waiting rooms from limited public fora into nonpublic fora. Moreover, even if the 1974 to 1991 policy had been freely chosen by HRA, government may, without offending the First Amendment, reverse policies regarding access to government property. See Perry, 460 U.S. at 46, 103 S.Ct. 948 (government "is not required to indefinitely retain the open character of" a limited public forum).[9]
 
 
 41
 It is true of course that if anyone able to perform services relevant to HRA's "official business" were free to enter HRA Job Center waiting rooms, the Centers might lose their nonpublic status. As noted above, where a forum is "generally available" to certain speakers or for the discussion of certain issues, it is a designated public forum. Ark. Educ. Television Comm'n, 523 U.S. at 679, 118 S.Ct. 1633. Therefore, if the Job Center waiting rooms were generally open to all those capable of transacting official business — e.g. all managed care providers, whether or not under contract with HRA — the Centers would likely be limited public fora. However, the language of the Executive Order, as modified by the district court, states that "[u]se of [HRA] Premises shall be limited to the transaction of official business," HRA Executive Order 651, and HRA makes admission determinations on an individualized basis. For example, managed care providers cannot walk in off the street to offer medical services in Job Center waiting rooms, although providing such services is technically a part of HRA's business. Rather, HRA investigates the providers, determines whether they are suitable and have insurance, and, if so, enters into service contracts with them before admitting them to Job Centers. A similar process is followed with regard to homelessness intervention service providers, the Census Bureau, and the Health Department.
 
 
 42
 Claimants and their statutorily permitted retained advocates are freely admitted because they too are there on official business. Neither claimants nor their retained advocates engage in expressive activity in the Job Center waiting rooms except for random, incidental discussions that are part of the kind of casual conversations that occur in waiting rooms generally. Rather, the purpose of admitting claimants and their retained advocates to the waiting rooms is to ensure an orderly flow of claimants to interviewers. Indeed, retained advocates may not solicit other clients in the waiting rooms, and supervisors periodically survey those in the waiting rooms to ensure that everyone is a claimant, someone legitimately accompanying a claimant, or otherwise on official business.
 
 
 43
 d) Reasonableness and Viewpoint Neutrality
 
 
 44
 Having determined that the Job Center waiting rooms are nonpublic fora, we must now address whether exclusion of advocacy groups in general and MRBW in particular is reasonable and viewpoint neutral, as required for upholding restrictions on expression in nonpublic fora. Cornelius, 473 U.S. at 811, 105 S.Ct. 3439. We conclude that it is.
 
 1. Reasonableness
 
 45
 Restrictions on speech in nonpublic fora must "be reasonable in light of the purpose of the forum ... and reflect a legitimate government concern." Perry v. McDonald, 280 F.3d at 169 (internal citation omitted) (alteration in original). See also Cornelius, 473 U.S. at 809, 105 S.Ct. 3439 (reasonableness of restriction "must be assessed in light of the purpose of the forum and all the surrounding circumstances"). A restriction will be reasonable if "it is wholly consistent with the [government's] legitimate interest in preserving the property ... for the use to which it is lawfully dedicated." Perry, 460 U.S. at 50-51, 103 S.Ct. 948 (internal citations and quotations omitted). However, such a restriction "need not be the most reasonable or the only reasonable limitation." Lee I, 505 U.S. at 683, 112 S.Ct. 2701 (internal quotations omitted).
 
 
 46
 With regard to property used to carry out specific governmental functions, government may reasonably reserve expression on that property exclusively for those conducting official business. "[W]hen government property is not dedicated to open communication the government may — without further justification — restrict use to those who participate in the forum's official business." Perry, 460 U.S. at 53, 103 S.Ct. 948. What expression takes place in Job Center waiting rooms is in the nature of casual conversation or in the course of official business. To reiterate, claimants and their advocates, who are present on official business, do not engage in expressive activity other than incidental casual conversations in waiting rooms. Authorized managed care organizations and the Health Department provide information to claimants, the Census Bureau takes surveys, and homelessness intervention contractors speak with claimants.
 
 
 47
 Of course, the definition of official business used must also be reasonable. See id. at 53 n. 13, 103 S.Ct. 948. In that regard, HRA reasonably determined that unlimited access for MRBW's representatives would not be for the purpose of transacting official business. HRA is required to provide, and provides, the services MRBW purports to offer — translation and help filling out forms, for example — and HRA has not contracted with MRBW to provide those services.
 
 
 48
 It was also reasonable for HRA to exclude MRBW and other advocacy organizations, independent of the official business policy. The government can reasonably exclude expression that undermines the purpose served by a nonpublic forum. The most common reason for such an exclusion is that the excluded expression is distracting or disruptive. Lee I, 505 U.S. at 683, 112 S.Ct. 2701 (exclusion based on "disruptive effect" reasonable). See also United States v. Kokinda, 497 U.S. 720, 732-34, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion) (same). Disruption can detract from a nonpublic forum's use for its intended purpose. For example, solicitation of money is disruptive in an airport terminal because it detracts from the purpose of allowing passengers to move as efficiently as possible. Such solicitation "`requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card.'" Lee I, 505 U.S. at 683, 112 S.Ct. 2701 (quoting Kokinda, 497 U.S. at 734, 110 S.Ct. 3115).
 
 
 49
 Avoiding other negative effects of expression can also justify limits on speech in nonpublic fora. For example, in Cornelius, the Court noted that it was harder to convince people to donate to a fundraising drive when advocacy groups were included because there was less universal agreement that such groups were worthwhile charities; because raising funds was a primary purpose of the drive, excluding controversial advocacy groups was reasonable. 473 U.S. at 810-11, 105 S.Ct. 3439. In Lee I, where a purpose of the airport terminals was to transport passengers safely and efficiently to their flights or ground transportation, it was reasonable to exclude solicitors because "unsavory" solicitors may take advantage of "the most vulnerable." 505 U.S. at 684, 112 S.Ct. 2701.
 
 
 50
 Also, where allowing private expression in a nonpublic forum may imply government endorsement of that expression, limiting or excluding speakers may be reasonable. Cornelius, 473 U.S. at 809, 105 S.Ct. 3439 ("avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum"); Kokinda, 497 U.S. at 726, 110 S.Ct. 3115.
 
 
 51
 The reasonableness of prohibiting expression by a certain speaker cannot be determined by reference only to the effect caused by that speaker alone. Lee I, 505 U.S. at 685, 112 S.Ct. 2701. Whether a restriction is reasonable must be determined with reference to the disruption or distraction that would result if all groups like the group at issue sought access. Where restrictions on expression are aimed at crowd control, for example, "`[o]bviously, there would be a much larger threat to the State's interest in crowd control if all other religious, nonreligious, and noncommercial organizations could likewise move freely.'" Lee I, 505 U.S. at 685, 112 S.Ct. 2701 (quoting Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 653, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)).
 
 
 52
 Finally, although the government may restrict expression in a nonpublic forum without ensuring the presence of adequate alternative outlets, the existence of such outlets may be considered in determining whether particular restrictions are reasonable. Perry, 460 U.S. at 53, 103 S.Ct. 948 ("the reasonableness of limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication"). In Lee I, the Port Authority prohibited solicitation within airport terminals, but allowed solicitation on the sidewalks outside the terminals. 505 U.S. at 675-76, 112 S.Ct. 2701. The fact that the outdoor sidewalk access might not be as desirable in all seasons as indoor terminal access did not render the Lee I rule any less reasonable.
 
 
 53
 Applying these standards, the exclusion of MRBW and other advocacy organizations was clearly reasonable, independent of the official business policy. This exclusion ensured the success of HRA's legitimate goals by limiting disruption in general, and especially disruption resulting from the perceived endorsement by HRA of MRBW's advice. It "rings of common sense," Kokinda, 497 U.S. at 734, 110 S.Ct. 3115 (internal quotation omitted), to believe that if untrained or minimally trained advocates advise claimants on the spot and without prior knowledge of their cases, misinformation with a disruptive effect may be disseminated. Moreover, prior experience can provide grounds for restrictions on speech. Id. at 735, 110 S.Ct. 3115 (access limits imposed where "because of a continual demand from a wide range of groups for permission to conduct fundraising or vending on postal premises, postal facility managers were distracted from their primary jobs by the need to expend considerable time and energy fielding competing demands for space and administering a program of permits and approvals"). HRA representatives testified from their own experience that welfare advocacy organizations disrupted HRA activities when operating community tables in the waiting rooms from 1974 through 1983 by incorrectly telling clients that they were entitled to certain benefits. Disappointed claimants threw papers off desks, overturned tables, and started fights. In at least one instance, a claimant who had been told he would receive an emergency check became angry and threatening when the check was not forthcoming.
 
 
 54
 Claimants themselves may also be disturbed by the presence of advocacy organizations. Like those being solicited for money in Lee I, claimants might feel pressured to talk to advocates, read their literature, or join their organization. MRBW, for example, tells claimants about its organization, gives them a flier, and invites them to join. Even if advocates do not solicit donations in welfare waiting rooms, welfare claimants would have less of an ability to escape unwanted advances than those being solicited in Lee I, who could simply walk away. Welfare claimants are a captive audience in the Job Center waiting rooms. HRA might therefore reasonably conclude that claimants prefer not to be bothered or approached in the waiting rooms or that vulnerable claimants might be taken advantage of by unscrupulous organizations that posed as legitimate advocacy groups.
 
 
 55
 Providing access to waiting rooms to advocates or others without official business would also lead to increased HRA processing and supervision costs. For example, if MRBW had access, all similarly situated (in a broad sense) groups would be entitled to equal access as well. Determining which organizations were similar to MRBW might require significant investigative efforts. Furthermore, Job Center waiting rooms do not have unlimited space. The number of advocates allowed in at any one time might have to be limited, and HRA employees might be forced to spend time scheduling those seeking access. HRA might then be accused of favoritism or suppression of speech based on these choices. Finally, HRA would have to expend more resources policing its waiting rooms to ensure that organizations were complying with scheduled access times, unapproved organizations were not operating in the waiting rooms, and approved organizations were not engaging in unapproved activities.[10]
 
 
 56
 Moreover, advocacy organizations can obtain access to welfare claimants in other venues. Specifically, like the solicitors in Lee I, advocates can speak to claimants on the public sidewalks outside the Job Centers. We also note that MRBW operates an office in the community where claimants can seek assistance.
 
 
 57
 Finally, as discussed above, restrictions "need not be the most reasonable or the only reasonable" limitations conceivable to pass constitutional muster. Lee I, 505 U.S. at 683, 112 S.Ct. 2701 (internal quotations omitted). For example, one may well believe that it would be more reasonable to allow access to all organizations that provide "direct benefits" to welfare claimants, rather than only to those that have "official business" in the Job Centers. However, any greater reasonableness of that "direct benefits" policy compared to the "official business" policy considered here is irrelevant as long as the latter policy meets the minimum standard for reasonableness, which we conclude it does.
 
 2. Viewpoint Neutrality
 
 58
 Even if a restriction on speech in a nonpublic forum is reasonable, it will be struck down if it "is in reality a facade for viewpoint-based discrimination." Cornelius, 473 U.S. at 811, 105 S.Ct. 3439. Viewpoint discrimination is a "subset or particular instance of the more general phenomenon of content discrimination," Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), in which "the government targets not subject matter but particular views taken by speakers on a subject," id. at 829, 115 S.Ct. 2510. Because of this overlap, the distinction between content discrimination — permissible in a nonpublic forum — and viewpoint discrimination — impermissible — is somewhat imprecise. Id. at 831, 115 S.Ct. 2510.
 
 
 59
 One thing is clear, however. It is permissible for government itself to use its property to express its own viewpoint on a subject without allowing others to express contrary viewpoints. See Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510 ("we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message"). When the government is the sole speaker, it need not ensure viewpoint diversity and can simply express its own viewpoint. Only where the government allows private parties to express their personal views in a nonpublic forum is it required to avoid viewpoint discrimination.
 
 
 60
 Therefore, if HRA is the only entity that expresses itself in the Job Center waiting rooms — i.e. if third parties with authorized official business are contractual agents speaking for HRA — there is no actionable viewpoint discrimination, because there is no discrimination. On the present record, we conclude that the parties allowed into the waiting rooms for expressive purposes — i.e. individuals other than claimants and those legitimately accompanying them — were conducting official business and were speaking for HRA, rather than for themselves. The managed care and homelessness intervention providers were providing services that HRA was required or allowed to offer. The Census Bureau officials, who were present to ensure accurate census representation of welfare recipients, and academics and government officials who viewed Job Centers were within HRA's official business and/or were in any event not engaged in expressive activity. Furthermore, as noted, the City Charter requires mayoral agencies to coordinate their activities with other government agencies. N.Y.C. Charter § 386(c). See note 2, supra.
 
 
 61
 Even if HRA were not the sole speaker in the waiting rooms, no viewpoint discrimination resulted from excluding those without official business generally or MRBW in particular. Speakers were not excluded because of this point of view; speakers were excluded if they did not have official business at the Job Center.
 
 
 62
 Of course, a facially neutral restriction may operate as a facade for excluding speakers expressing certain viewpoints while allowing those expressing other viewpoints to enter. In such a case, the restriction is not viewpoint neutral and is impermissible. Cornelius, 473 U.S. at 812, 105 S.Ct. 3439 (valid and reasonable justifications for a restriction "cannot save an exclusion that is in fact based on the desire to suppress a particular point of view"); Kokinda, 497 U.S. at 736, 110 S.Ct. 3115; General Media, 131 F.3d at 275, 281 n. 11 (law's gender neutrality did not conclusively establish its viewpoint neutrality). However, MRBW has offered no evidence that HRA's access policy was based on bias against its viewpoint rather than on preserving the Job Centers for their intended purposes.
 
 CONCLUSION
 
 63
 For the foregoing reasons, we hold that Job Center waiting rooms are nonpublic fora, and that excluding those without official business, including MRBW, is reasonable and viewpoint neutral. We therefore affirm.
 
 
 
 Notes:
 
 
 [1]
 Four versions of the Code of Conduct have been enacted since 1974,see HRA Executive Order Nos. 510, 618, 639, 651, but the paragraph about the use of Job Center premises has been substantively identical in each version.
 
 
 [2]
 The City Charter allows heads of mayoral agencies such as HRA to contract with private parties to perform official duties, such as Medicaid provision and homelessness intervention services. N.Y.C. Charter § 389(c) ("Heads of mayoral agencies may... enter into contracts ... to fulfill the duties assigned to them."). City regulations require HRA to grant access to Job Center appointments to retained advocates. 18 N.Y. Cong.Codes R. & Regs. tit. 18, § 351.1(d) ("An applicant or recipient shall be permitted to appear with an attorney or other representative at any interview or conference with a representative of a social services district."). The City Charter requires mayoral agencies to coordinate their activities with other government agencies, such as the Health Department or Census BureauSee N.Y.C. Charter § 386(c) ("To the maximum extent feasible, heads of mayoral agencies shall coordinate the activities of their agencies with those of other city, state, and federal agencies and other organizations and institutions on matters within their jurisdiction by such means as the mayor may require and, when not inconsistent with mayoral directives, by such means as the agency head may deem appropriate.") Finally, tour groups escorted by HRA officials pass through waiting rooms, do not speak with claimants, do not engage in expressive activity, and remain for insubstantial periods of time. Sanchez, 2002 U.S. Dist. LEXIS 10911, at *18-20, 2002 WL 1343754, at *6.
 
 
 [3]
 The court also held that HRA's policy did not violate the due process or equal protection rights of plaintiff-claimants. However, because no plaintiff-claimants remain in this case, we need not address this holding
 
 
 [4]
 The parties dispute the level of scrutiny applicable to restrictions on speech that falls within the genre of speech allowed in a limited public forumCompare General Media Communs. v. Cohen, 131 F.3d 273, 278 n. 6 (2d Cir.1997) ("In designated public forums whose use is limited to particular purposes or speakers, restrictions on speech within those limits need only be reasonable and viewpoint neutral.") with Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dept. of Parks and Recreation ("HERE"), 311 F.3d 534, 545 (2d Cir.2002) ("In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened."). Our holding obviates the need to resolve this dispute.
 
 
 [5]
 MRBW incorrectly asserts that the "key question" in forum analysis "is whether the government's use of the property is compatible with various kinds of expressive activity," Appellant's Br. at 21 (internal quotation omitted). Compatibility with expressive activity is one relevant issue, usually emphasized when incompatibility with expressive activity is relied upon to hold that a forum is nonpublicSee Lee I, 505 U.S. at 681, 112 S.Ct. 2701. However, compatibility with expressive activity is not sufficient to make a forum public. Rather, governmental intent is the "key question" in forum analysis.
 
 
 [6]
 InCornelius, for example, the government allowed the fundraising drive to access the federal workplace for the purpose of minimizing disruption "by lessening the amount of expressive activity occurring on federal property." 473 U.S. at 805, 105 S.Ct. 3439. Its anti-expressive purpose indicated that the fundraising drive was a nonpublic forum. As we have noted, the public school mail facilities in Perry were nonpublic because their "`normal and intended function... is to facilitate internal communication of school-related matters to the teachers.'" N.Y. Magazine, 136 F.3d at 129 (citing Perry, 460 U.S. at 47, 103 S.Ct. 948). In Fighting Finest, the purpose of granting some access to police precinct bulletin boards was to "promote [the police department's] own internal objectives." 95 F.3d at 230. Reasoning in part from this purpose, we held that the bulletin boards were nonpublic forums. Id. at 230. Finally, in Perry v. McDonald, we held that vanity plates were nonpublic forums because their purpose was to raise state revenue and "[n]othing about the revenue-raising aim of the vanity-plate regime suggests that Vermont intended to create a forum for unlimited public expression." 280 F.3d at 167 (internal quotation omitted).
 
 
 [7]
 Although the "specifically authorized" clause was held by the district court to be unconstitutionally vague, its use by HRA evidences the agency's intent in consistently declining to open the waiting rooms to expressionSee Lebron, 69 F.3d at 656.
 
 
 [8]
 To the extent that academic tours are not official business, a debatable issue, the tour groups are not allowed to engage in expressive activity in the waiting rooms. They are in the waiting rooms for five minutes at most, and speak with no one
 
 
 [9]
 Furthermore, the physical characteristics of the waiting rooms are also not particularly compatible with free expression. The waiting rooms are limited in size, occupied by people who have to be there to obtain benefits, set off from the public streets and sidewalks, and are open only during the Centers' business hours
 
 
 [10]
 MRBW has argued that excluding unretained advocates because of the disruption they cause is unreasonable, because retained advocates can enter. We disagree for several reasons. Most importantly, retained advocates are admitted to waiting rooms to wait with their clients for interviews, not to engage in expressive activity (other than incidental, casual conversation). They are not allowed to solicit other clients. It is reasonable for HRA to conclude that unretained advocates soliciting clients are potentially more disruptive than retained advocates who cannot solicit clients. Furthermore, retained advocates serve one claimant at a time and have dealt with that claimant prior to arrival at a Job Center. All things being equal, retained advocates are likely to understand their clients' cases more fully, to be more prepared, and to be less likely to provide incorrect information and advice