Antonio PECK, a minor by and through his parents and next friends, JoAnne Peck and Kenley Lester Peck, Plaintiff–Appellant,

v.

BALDWINSVILLE CENTRAL SCHOOL DISTRICT, Catherine McNamara Elementary School, Robert Creme, individually, and in his official capacity as principal of Catherine McNamara Elementary School, and Theodore Gilkey, individually, and in his official capacity as Superintendent for Baldwinsville School Board of Education, Defendants–Appellees.

Docket No. 04–4950–CV.

United States Court of Appeals, Second Circuit.

Argued: May 27, 2005.

Decided: Oct. 18, 2005.

620

Rena M. Lindevaldsen, Liberty Counsel, Longwood, FL (Matthew D. Staver, Erik W. Stanley, Anita L. Staver, and Mary E. McAlister, on the brief), Lead Counsel for Plaintiff–Appellant.

Brian Raum, The Gucciardo Law Firm, New York, NY, Local Counsel for Plaintiff–Appellant.

Louis Orbach, Bond, Schoeneck & King, PLLC, Syracuse, N.Y. (Lillian Abbott Pfohl, on the brief), for Defendants–Appellees.

Before: CALABRESI, KATZMANN, and B.D. PARKER, Circuit Judges.

CALABRESI, Circuit Judge.

This case invites us to cut a path through the thorniest of constitutional thickets—among the tangled vines of public school curricula and student freedom of expression.

Plaintiff–Appellant Antonio Peck ("Antonio"), by and through his mother ("JoAnne Peck") and father (collectively, "the Pecks"), filed this Section 1983 action against Antonio's school district, Baldwinsville Central School District, the principal of Antonio's elementary school, Robert Creme, and the district superintendent, Theodore Gilkey (collectively, "The District"). The Pecks alleged that officials at Antonio's elementary school had censored one of his school assignments to exclude religious content, and had thereby violated both the Establishment Clause and Antonio's First Amendment right to free speech.[1] The district court (Mordue, *J.*) dismissed both claims on summary judgment, concluding, as a matter of law, that a) The District's censorship of Antonio's assignment was viewpoint neutral, b) the censorship was justified by legitimate pedagogical concerns, and c) The District's actions bespoke neither State-advancement nor State-inhibition of religion.

We now affirm the district court's determination that no Establishment Clause violation attended The District's actions, but vacate and remand the court's disposition of the Pecks' free speech claims.

## I. Background

The following facts, contained in the record on The District's motion for summary judgment, are recounted in the light most favorable to the Pecks.

### THE POSTER ASSIGNMENT AND THE SCHOOL RESPONSE

During the 1999–2000 school year Antonio was a kindergarten student at the Catherine McNamara Elementary School, enrolled in a class taught by Susan Weichert ("Weichert"). Part of the kindergarten curriculum taught by Weichert was a two-month environmental unit that, according to Weichert's deposition testimony, focused on "simple ways to save the environment, such as preserving trees and animals, using water and other natural resources sparingly and wisely, keeping the environment clean, et cetera." The unit culminated, near the end of the school

---

1. The original complaint stated additional claims of denial of Equal Protection and abridgment of Antonio's First Amendment right to the free exercise of his religion. Those claims have been abandoned on appeal.

year, in an assignment in which students in the class were instructed to create a poster showing what they had learned about the environment. Weichert described the instructions about the assignment that she gave to her class in the following way:

> We wanted them to create a poster at home showing some of the things that we had been learning throughout the two months and previously all the way back to September about ways that they could help the environment.... [W]e discussed to the children that they needed to show us in their assignment what they had been learning the last couple of months in class during our environmental units, that their poster should reflect what they had been learning in class.

Each child would also be given an opportunity to present his or her poster to the class, and to explain what the poster showed and how its content related to the environment.

In addition to the poster project, all four kindergarten classes at Catherine McNamara Elementary School also put on an environmental assembly. The assembly, an annual event to which parents of the students were invited, took place in the school cafeteria and consisted of students planting a tree and singing environmentally-themed songs. In addition, the kindergartners' posters would be displayed at the assembly.

Weichert sent two notes home to the parents of her kindergartners in connection with the poster assignment and the environmental assembly. The first, inviting parents to the assembly and explaining the contours of the poster assignment, stated:

> Dear Parents,
>
> We are writing to inform you about our environmental program that we will be presenting to the parents on June 11th.... [As] in previous years, as part of our environmental program and as a culminating activity, we will plant a tree on the school grounds. To raise funds to purchase this tree, we have asked the children to bring in returnable cans. We will start collecting cans immediately. We appreciate your involvement in this project.
>
> To enhance the student's understanding of his environment, we are asking students to make an environmental poster at home and bring it to school by June 4th. These posters will be on display at our program. The children may use pictures or words, drawn or cut out of magazines or computer drawn by the children depicting ways to save our environment, i.e. pictures of the earth, water, recycling, trash, trees etc. This should be done by the student with your assistance. The poster should be able to fit in the child's backpack. We hope this project will be fun for all!

Subsequently, a second note was sent home announcing a time change in the June 11 program, and reminding parents that "each student should be working on his environmental poster to be hung up at the program. Ideas should involve ways to save our earth and it should be the child's work. Pictures drawn, cut out of magazines, or computer drawn are all great ideas."

JoAnne Peck described in her deposition testimony the process by which Antonio prepared his poster assignment. Peck stated that she and Antonio sat down together one night to do the poster, and she told Antonio that the school wanted him to do a poster on how to save the environment. Antonio responded, according to Peck, that the only way to save the world was through Jesus. Peck then provided Antonio with art materials and some magazines, and Antonio selected pictures, cut them out, and, with his mother's assis-

tance, arranged them on a piece of paper. Antonio (who could not read) told his mother what he wanted the poster to say, and Peck wrote out what Antonio said so that he could include the words on to the poster.

This poster, which was turned in to Weichert, was comprised of the following images: a robed figure (who is described by both parties as "Jesus") kneeling and raising his hands to the sky, two children on a rock bearing the word "Savior," and the Ten Commandments. Written on the poster were the phrases, "the only way to save our world," "prayer changes things," "Jesus loves children," "God keeps his promises," and "God's love is higher than the heavens."

Upon receiving Antonio's poster Weichert took it to the school principal, Robert Creme ("Creme"). Creme told Weichert that Antonio should be instructed to do another poster. Creme also contacted Superintendent Theodore Gilkey ("Gilkey") to tell him of the situation and of how Creme had decided to handle it. Gilkey agreed with the decision to have Antonio prepare a second poster.

Some time after Antonio turned in his first poster, JoAnne Peck attended an art show at the elementary school. At the show she saw Weichert, who told her, for the first time, that Antonio's poster would not be displayed at the environmental assembly. According to Peck, Weichert stated that "she legally didn't think she could hang the poster for religious reasons," and also that the poster didn't demonstrate Antonio's learning of the environmental lessons. Peck subsequently contacted Creme, who told her that Antonio could make a new poster with "a little bit of religious content and more showing the recycling, kids throwing trash . . . .

[or] kids holding hands around the world."[2]

Soon thereafter, Antonio and his mother sat down together to do a second poster. According to Peck's deposition testimony, she again assisted Antonio in selecting images (from the computer and from a religiously-themed coloring book), and in arranging pictures on the poster. The second poster depicted, on its left side, the same robed, praying figure pictured in the first poster. It also showed, in the center, a church with a cross. To the right of the church were pictures of people picking up trash and placing it in a recycling can, of children holding hands encircling the globe, and of clouds, trees, a squirrel, and grass.

After receiving the second poster Weichert again took it to Creme, who, according to Weichert, stated "[t]hat there were portions of the poster . . . that clearly showed an understanding of some of the things that I had been teaching in the environmental unit [and] there was a portion that didn't relate to what . . . had been t[aught]." Creme then told Weichert "that we should hang the poster [at the environmental program] with the kneeling figure folded under."

Notwithstanding Creme's determination that Antonio's second poster was partly unacceptable, Antonio was allowed to "show and tell" his poster to his own kindergarten class. According to Weichert, when Antonio presented his poster she asked him "to explain the poster to the class and how he could help the earth. . . . He said you could pick up trash and help keep the earth clean." Antonio did not mention the robed figure or the church, or make any reference to God or religion, in his explanation. Weichert never asked

---

**2.** The Pecks do not, at this stage of the litigation, base any of their claims on The District's conduct in relation to the first poster.

Antonio—either during his presentation, or privately—to explain the significance of the robed figure.

Antonio's poster was displayed at the June 11 environmental assembly, alongside those of approximately eighty other kindergartners, on the wall of the school cafeteria. Pursuant to Creme's instructions, however, Weichert asked the parent volunteer who was hanging the posters to place Antonio's on the wall with the robed figure (the left-hand side of the poster) folded under. Apparently because of a mistake made by the parent volunteer, a greater portion of the poster than Weichert had intended was concealed: the poster was ultimately displayed with both the robed figure and half of the church folded under. Only the right half of the church (including the cross) was visible, along with the above-described images of recycling, children holding hands, and the nature-related pictures. Antonio's poster, folded as thus described, was smaller than some of the other students' projects, but was the same size as others.

### EVIDENCE CONCERNING THE DISTRICT'S MOTIVATIONS

Several aspects of Weichert's and Creme's deposition testimony were particularly relevant to the question of The District's rationale for censoring Antonio's poster.

With respect to the first poster turned in by Antonio, Weichert testified that she took the poster to Creme because she

> didn't know what to do with this specific poster which, number one, did not deal with anything that ... had [been] taught in the classroom for the last nine months and Antonio had, as far as [she]

could see, gone over and above the bounds of [the] assignment. Didn't have anything to do with [the] assignment.

Creme, for his part, testified that he had four reasons for deciding that Antonio should redo the first poster: a) because the poster had "absolutely no relevance or relationship to the assignment at all"; b) because, based on his familiarity with Antonio's reading and writing ability and knowledge of abstract concepts, he "was quite certain that [the poster] was not Antonio's work, at least not in conceptual form"; c) because he knew that Weichert would be asking the children to present the posters to the class, and that, since Antonio would be unable to read the poster, Weichert would have to read it for him,[3] and d) because the poster did not utilize and reinforce the concepts presented in class, and therefore did not accomplish the goals of the assignment. With respect to Antonio's second poster, Creme stated that he "did not object to [it] solely on its religious content," but also on the grounds that the kneeling figure was "an exact replication of something ... that we had every reason to believe Antonio was not responsible for," that the kneeling figure had "no relevance ... to the assignment he was given," and that the poster was "not Antonio's work."

Much of Creme's deposition consisted of questions concerning his hypothetical response to poster assignments that contained imagery that was beyond the scope of what had been taught during the environmental unit, but that was non-religious—for example, pictures of animals not discussed in class. In each case, Creme stated that his response would de-

---

**3.** Creme elaborated that Weichert's reading of the poster was problematic for two reasons: a) because it would "put Antonio in a situation where he would be embarrassed in front of his peers by not being able to explain

anything on this poster," and b) because it would "put Mrs. Weichert in the position of having to explain it to the class, thereby having it come from her and in effect become part of her instruction."

pend upon the student's explanation as to why the image was shown on the poster. Thus, Creme stated that if Weichert had received a poster showing a manatee, an animal that had not been covered in the environmental unit, "[e]ducationally what [she] should do is begin asking a series of questions. What she does beyond that point would be solely dependent on the response of the student, the rest of the students in the class and wherever the direction went." Like Weichert, Creme never asked Antonio to explain the relevance to the environmental unit of the images on either of his posters. But Creme also testified that the ultimate decision of whether to accept a hypothetical poster that contained religious imagery and that did meet all of his objections to Antonio's poster—*i.e.*, that was the student's work, that did represent the conceptual level of learning of which the student was capable, and that had a relationship to the assignment that could be adequately explained by the student—depended ultimately on "a whole bunch of other factors" that he was unable to predict.

Weichert, too, was asked, during her deposition, about how she would react to hypothetical posters that depicted topics not specifically discussed during the environmental unit, but were non-religious, or that were religious but were accompanied by an explanation of their relevance to the assignment. Weichert testified, for example, that if a child had put a Sierra Club logo, or a picture showing a forest fire, or a manatee on the poster, Weichert would have displayed it so long as the student could explain to her how the images pertained to saving the environment. Weichert also stated that, even if Antonio had explained to her the relevance of God or religion to the topics discussed during the environmental unit, she still would not have accepted the first poster, or displayed the censored portion of the second poster. In this respect she stated:

[I]f God is going to save the environment, that isn't something that we discussed in the classroom.... [A] religious overtone to the saving of the earth ... was not taught in the curriculum in kindergarten. Therefore, I would not have accepted it because it was not taught in what the children could do to help the earth.

Also on this point Weichert said, "If [an] item [on a poster] is talking religion even though it's saving the environment, it's still religiously saving the environment which is not something that was ever discussed in the classroom." Finally, Weichert testified that she believed that, had the "purely religious" aspects of Antonio's poster been displayed at the environmental assembly, parents in attendance might have believed that Weichert had included religious instruction in the environmental unit.

## PRIOR PROCEEDINGS

This case came to us once before, following the district court's grant of The District's pre-answer motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The court treated the motion as one for summary judgment, and dismissed all of the Pecks' claims. In an unpublished order, our court held that the Rule 12(b)(6) conversion to a summary judgment motion was done without sufficient notice to the Pecks, and, as a result, deprived the Pecks of the opportunity to take discovery and present evidence on several key disputed facts. *See Peck v. Baldwinsville Sch. Bd.*, 7 Fed.Appx. 74, 2001 WL 303755 (2d Cir. March 28, 2001). In particular, we noted that further discovery might uncover a) evidence of animus or hostility by The District toward Christianity or toward religion generally, and b) indications as to the accuracy of The District's claim that Antonio's poster was not responsive to the assignment. Depending upon the fruits of discovery, we observed,

"the case would be very different from a motivation stemming from a legitimate pedagogical concern." *Id.* at *2. Accordingly, we vacated the judgment and remanded the case to the district court.

On remand, and following discovery, The District moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motion was granted as to all claims, and the instant appeal ensued.

## II. Discussion

### A. Standard of Review

Our standard of review on appeals from a decision on summary judgment is familiar. We review *de novo* the district court's grant of summary judgment, affirming only if the movant has demonstrated that there is no genuine issue as to any material fact and, hence, that judgment as a matter of law is warranted. *See, e.g., Make the Rd. by Walking, Inc. v. Turner,* 378 F.3d 133, 142 (2d Cir.2004); *see also* Fed.R.Civ.P. 56(c). In determining whether a case presents triable factual issues, we, like the district court, may not make credibility determinations or weigh the evidence, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and we must resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, *see Konits v. Valley Stream Cent. High Sch. Dist.,* 394 F.3d 121, 124 (2d Cir.2005).

### B. Free Speech Claim

The Pecks' first argument on appeal is that the district court erred in its conclusion that no triable issues of fact had been raised in connection with their claim that The District's censorship of Antonio's poster violated Antonio's First Amendment

right to free speech.[4] The Pecks contend a) that the court erroneously analyzed The District's actions under the rubric set forth by the Supreme Court in *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), rather than under the more speech-protective standard of *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); and b) that, even under the standards enunciated in *Hazelwood,* disputed issues of material fact had been raised with respect to the reasonableness and viewpoint neutrality of The District's actions. Although we agree with the district court that *Hazelwood,* rather then *Tinker,* provides the applicable framework for our analysis of the speech restrictions at issue in this case, we think that the Pecks have raised genuine issues of material fact under that standard, and therefore agree with the Pecks that summary judgment should not have been granted as to the free speech claim.

### 1. Applicable Level of Constitutional Scrutiny

██ Because the level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs, we must first consider what sort of forum had been created for the environmental poster assignment. *See Make the Rd. by Walking,* 378 F.3d at 142. Following the lead of the Supreme Court, we have tended to classify fora for expression in four categories that, correspondingly, fall along a spectrum of constitutional protection. The first, and most speech-protective forum is the "traditional public forum." This category is comprised of those places—streets,

---

4. The First Amendment's admonition that "Congress shall make no law ... abridging the freedom of speech" has, of course, been applied to state governments through the Due Process Clause of the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

parks, and the like—"which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* (internal quotation marks omitted). In these fora, "[c]ontent-based restrictions will be upheld only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end." *Id.* (internal quotation marks and alterations omitted).

The "designated public forum," and its subset, the "limited public forum," fall next along the spectrum. *Id.* at 142–43. A "designated public forum" is a place not traditionally open to public assembly and debate—a public school, for example—that the government has taken affirmative steps to open for general public discourse. *Id.* Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use. *Id.* at 143. A "limited public forum," instead, is created when the State "opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Hotel Employees & Rest. Employees Union Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir.2002). In limited public fora, the government may make reasonable, viewpoint-neutral rules governing the *content* of speech allowed. *Id.* at 545–46; *see also Good News Club v.*

*Milford Cent. Sch.*, 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

Garnering the lowest level of scrutiny along the forum analysis spectrum is the "non-public forum,"[5] which is neither traditionally open to public expression nor designated for such expression by the State. "Restrictions on speech in a nonpublic forum need only be reasonable and viewpoint neutral." *Make the Rd. by Walking*, 378 F.3d at 143; *see also Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." (internal citations omitted)).

The parties apparently agree that neither Antonio's classroom, nor the school cafeteria, nor any other aspect of the Catherine McNamara Elementary School, was a traditional public forum. They also agree that none of these was a forum that had been designated for public expression, and the record clearly supports this position. No evidence points to any affirmative steps taken by The District, in the context of the events pertaining to this case, to open these facilities to *public* use and ex-

---

**5.** The Supreme Court has indicated, and our cases have echoed, that when the government restricts its *own* speech, the appropriate level of judicial scrutiny falls somewhere off the above-described spectrum of forum analysis. *See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (stating that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes"); *Make the Rd. by Walking*, 378 F.3d at 151 ("When the government is the sole speaker, it need not ensure viewpoint diversity and can simply express its own viewpoint. Only where the government allows private parties to express their personal views in a nonpublic forum is it required to avoid viewpoint discrimination.").

pression. *Cf. Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562 ("[S]chool facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or by some segment of the public .... If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created ...."). Hence, there is no dispute that The District was entitled, in the non-public fora at issue in this case, at least to regulate the content of Antonio's poster in a reasonable manner. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439.

The parties do, however, contest the nature of—and level of constitutional protection to be accorded to—the student expression represented by Antonio's poster. The Supreme Court has recognized that, while "[s]tudents in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" *Hazelwood*, 484 U.S. at 266, 108 S.Ct. 562 (quoting *Tinker*, 393 U.S. at 506, 89 S.Ct. 733), nevertheless "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" *Id.* (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), and *Tinker*, 393 U.S. at 506, 89 S.Ct. 733). These "special characteristics" have led the Supreme Court to identify, broadly, two categories of student expression in the school environment, each of which merits a different degree of judicial scrutiny in connection with school-imposed speech restrictions.

The first category, encompassing students' "personal expression that happens to occur on the school premises," was explored by the Court in *Tinker*, a case that considered a school district's punishment of junior high and high school students who wore black armbands to school in opposition to the Vietnam War. In holding that the First Amendment did not permit such silencing of student opinion, the Court stated:

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process.... When [a student] is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so *without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others.*

*Id.* at 512–13, 89 S.Ct. 733 (internal footnote, quotation marks, and alteration omitted and emphasis added).

Almost twenty years later, the Court in *Hazelwood* considered the relevance of *Tinker*'s "material and substantial interference" test for school censorship of student expression in the context of a class assignment. The speech at issue consisted of two articles that were written by students in a high school journalism class and that were to appear in a school newspaper published as part of the class's curriculum. The articles addressed pregnancy in the high school and the impact of divorce on the school's students. The school principal objected to their publication on the grounds that a) the pregnancy articles contained insufficient protections for the sources' anonymity and addressed subject matter that was too sensitive for the

school's younger students, and b) that the author of the divorce article had not given the parents of some students profiled in the piece the opportunity to respond to some of the students' allegations.[6] *Hazelwood*, 484 U.S. at 262–64, 108 S.Ct. 562.

In assessing the Hazelwood School District's actions, the Court deemed *Tinker* inapposite to the context of student expression that the court characterized as curricular and, hence, "school-sponsored":

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as *part of the school curriculum,* whether or not they occur in a traditional classroom setting, so long as they are *supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.*

*Id.* at 270–71, 108 S.Ct. 562 (emphasis added). *Tinker's* "material and substantial interference" standard was, in the Court's view, insufficiently deferential to the prerogative of educators to "assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Id.* at 271, 108 S.Ct. 562. Accordingly, *Hazelwood* held, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are *reasonably related to legitimate pedagogical concerns." Id.* at 273, 108 S.Ct. 562 (emphasis added and footnote omitted).

 Contrary to the Pecks' contention that "[i]t is difficult to see how the Plaintiff's poster is any different than the armbands worn in the *Tinker* case," we think it clear that the facts in the record bring Antonio's poster, the vehicle of his censored expression, within *Hazelwood's* framework. It is undisputed that the poster was prepared by Antonio pursuant to a class assignment, and one that was given under highly specific parameters: to "depict[ ] ways to save our environment" and to reflect what had been taught in the kindergarten environmental unit.[7] Addi-

6. In addition, as the Court's opinion recounts, several other, otherwise unobjectionable articles were censored because they had been slated to appear on the same pages as articles that the principal ordered removed, and there was, according to the school, insufficient time prior to publication to reformat the newspaper. *Hazelwood*, 484 U.S. at 264 n. 1, 108 S.Ct. 562.

7. We are unpersuaded by the Pecks' contention that, based on the letters sent home to the kindergarten parents, in which the poster assignment was described without reference to the requirement that the posters address topics discussed in class, triable issues have been raised as to the scope and open-endedness of the poster assignment. It is undisputed that Weichert, as she described in her deposition testimony, instructed Antonio's class to create a poster that reflected the topics addressed in class. Whether the parents had an identical or different understanding of the goals of the poster project does not alter the fact that, as delivered to the students, the assignment was not open-ended.

tionally, the posters were to be displayed at a school-sponsored assembly, to take place in the school cafeteria, to which parents of the kindergartners were invited. Aside from the students' posters, the environmental assembly included songs and other presentations that were prepared as part of the kindergarten curriculum.

These undisputed facts demonstrate that the poster assignment and the environmental assembly at which the posters were hung—perhaps even more starkly than in the context of the newspaper articles at issue in *Hazelwood*—were indisputably "part of the school curriculum .... supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271, 108 S.Ct. 562. *See also Axson–Flynn v. Johnson*, 356 F.3d 1277, 1289 (10th Cir.2004) ("Few activities bear a school's 'imprimatur' and 'involve pedagogical interests' more significantly than speech that occurs within a classroom setting as part of a school's curriculum." (quoting *Fleming v. Jefferson County Sch. Dist. R–1*, 298 F.3d 918, 924 (10th Cir. 2002)); *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1214 (11th Cir.2004) (finding that a student's murals constituted school-sponsored expression because they were located in prominent school locations where members of the public might reasonably believe that they bore the imprimatur of the school); *Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 155–56 (6th Cir.1995) ("Where learning is the focus, as in the classroom, student speech may be even more circumscribed

than in the school newspaper or other open forum.").

Accordingly, we find the case before us to fall within the core of *Hazelwood*'s framework. And, the district court correctly concluded that the *Hazelwood* "reasonable relation to legitimate pedagogical concerns" test provides the appropriate lens through which to examine The District's censorship of Antonio's poster.

### 2. Application of *Hazelwood*

#### a) Was there a fact question as to viewpoint discrimination?

■ We must ask, then, whether the record demonstrates triable issues as to whether The District's reasons for censoring Antonio's poster are, in the language of *Hazelwood*, "reasonably related to legitimate pedagogical concerns." *Id.* The parties agree that the relevant "pedagogical concerns" proffered by The District are: a) that the portion of Antonio's poster depicting the robed figure was not responsive to the assignment; b) that the placement of that image on the poster was not Antonio's own work; and c) that showing the image risked creating the impression that the kindergarten environmental unit had included the teaching of religion. The Pecks contend that it cannot be said as a matter of law that these concerns pass muster under *Hazelwood* a) because factual disputes foreclose a determination, on summary judgment, as to the reasonableness of the school's judgment that Antonio's poster implicated legitimate pedagogical concerns,[8] and b) because the record

---

8. We note that the Pecks do not seriously dispute the legitimacy, at least in the abstract, of the pedagogical concerns cited by The District. Unquestionably, whether a student's work is responsive to an assignment, whether the student is responsible for the work he or she has turned in, and whether the display of a school-sponsored, religious student speech might be perceived as promoting or instructing religious perspectives are interests that are part and parcel of a school's responsibility to ensure that "participants learn whatever lessons the activity is designed to teach" and that "the views of the individual speaker are not erroneously attributed to the school." *See Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562.

may be read to support a finding that The District's enforcement of these interests was carried out in a non-viewpoint-neutral manner.

■ We reject some of the Pecks' arguments concerning The District's treatment of Antonio's poster—their claim, for example, that Weichert and Creme incorrectly determined that JoAnne Peck, rather than Antonio, was responsible for the poster's content—on the ground that they overstate the scrutiny that *Hazelwood* contemplates applying to The District's cited interests. In *Hazelwood* itself, the Court did not inquire into the *accuracy* of the principal's contention that because of time concerns, censorship of the articles in question, rather than judicious editing, was required. The Court found the principal's judgment on this score reasonable, notwithstanding that he "did not verify whether the necessary modifications could still have been made in the articles," and that the faculty supervisor did not "volunteer the information that printing could be delayed until the changes were made." *Hazelwood*, 484 U.S. at 275, 108 S.Ct. 562. "The *Hazelwood* standard does not require that the guidelines be the *most* reasonable or the *only* reasonable limitations, only that they be reasonable." *Fleming*, 298 F.3d at 932 (internal quotation marks omitted, alteration omitted, and emphasis added). Just as *Hazelwood* requires only that the school's employed method of censorship be reasonable, we similarly conclude that the predicate factual determinations made by the school in triggering the censorship need only be reasonable. Here, because Weichert and Creme made a reasonable determination that JoAnne Peck (and not Antonio) was responsible for the poster's content, we decline any invitation to assess the accuracy of this determination. If this were the only factual dispute raised by the Pecks, we most likely would affirm the district court's judgment

as to the reasonableness of The District's actions.

Other fact questions to which the Pecks point, however, implicate a more troubling concern: the viewpoint neutrality of The District's decision with respect to Antonio's poster. The district court concluded that there were no triable issues as to whether The District had engaged in viewpoint discrimination because, it said, the robed figure shown on Antonio's poster was unquestionably beyond the scope of the poster assignment. It therefore was not speech addressed to an otherwise permissible subject, that was censored on the basis of its viewpoint on the subject. In our judgment, however, the district court overlooked evidence that, if construed in the light most favorable to Pecks, suggested that Antonio's poster was censored *not* because it was unresponsive to the assignment, and not because Weichert and Creme believed that JoAnne Peck rather than Antonio was responsible for the poster's content, but because it offered a religious perspective on the topic of how to save the environment.

We recognize at the outset that drawing a precise line of demarcation between content discrimination, which is permissible in a non-public forum, and viewpoint discrimination, which traditionally has been prohibited *even* in non-public fora, is, to say the least, a problematic endeavor. As the Supreme Court has observed, particularly in the context of religious expression, it can be difficult to discern what amounts to a subject matter unto itself, and what, by contrast, is best characterized as a *standpoint* from which a subject matter is approached. *See Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of

thought. The nature of our origins and destiny and their dependence upon the existence of a divine being have been subjects of philosophic inquiry throughout human history."). *Compare Good News Club*, 533 U.S. at 107–08, 121 S.Ct. 2093 (characterizing a group's meetings for prayer and religious discussion as offering one perspective on morals and character, which were otherwise permissible topics in the limited public forum at issue); *with id.* at 131–33, 121 S.Ct. 2093 (Stevens, *J.*, dissenting) (characterizing the meetings not as offering a "religious viewpoint" but as constituting otherwise-prohibited "religious proselytizing").

Nevertheless, we think that there are at least disputed factual questions, which may not be resolved on summary judgment, as to whether Antonio's poster offered a "religious viewpoint," and whether, if the poster had depicted a purely secular image that was equally outside the scope of Weichert's environmental lessons, it would similarly have been censored. As described above, Weichert testified that there were a number of potential images that Antonio could have placed on his poster, such as specific endangered species, the Sierra Club logo, and atoms, all of which would have been non-responsive to the assignment to the extent that such topics were not specifically covered in class. She indicated that she would not have folded over such images: "I can't imagine that there would have been any parent that would have objected to a manatee because they wouldn't have construed it as anything other than an animal ... Because it had no religious significance, ... therefore I wouldn't have had to worry about anybody being offended by-no strike, not be offended, anyone would surmise that I may have been teaching religion in kindergarten." Additionally, both she and Creme testified that had such images appeared on a student's poster, the student would have been asked the relevance of the picture to what he had learned in class. As both Weichert and Creme acknowledged, however, Antonio was never asked directly whether the robed figure bore any connection to the environment. One possible interpretation, of course, is that Weichert and Creme viewed the Jesus image as being so wholly outside the scope of the curriculum that further inquiry was unnecessary before censoring the image, and that they would have also censored a secular image that was equally non-responsive. On summary judgment, however, we must draw all factual inferences in favor of the Pecks. In this regard, we think that it is also possible to interpret the testimony of Weichert and Creme as indicating that they were particularly disposed to censor Antonio's poster because of its religious imagery and that they would not necessarily have similarly censored secular images that were equally non-responsive. Were these facts ultimately proved, The District's actions might well amount to viewpoint discrimination.

### b) Does *Hazelwood* permit viewpoint discrimination "reasonably related to legitimate pedagogical concerns"?

The District counters that, even assuming there to be evidence that its decision was based on the *viewpoint* rather than the *content* of Antonio's poster, the district court's dismissal of the free speech claim would still have been proper because *Hazelwood* permits schools to discriminate on the basis of viewpoint—so long as such discrimination is, itself, reasonably related to a legitimate pedagogical interest. Whether *Hazelwood* represents a departure from the long-held requirement of viewpoint neutrality in any and all government restriction of private speech, *see, e.g., Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 ("Viewpoint discrimination is ... an egregious form of content discrimination. The government must abstain from regu-

lating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."), is an issue that has been the subject of much debate among Circuit Courts, which have reached conflicting conclusions.[9]

As the varying approaches of other courts suggest, the proper answer to the question of whether *Hazelwood* contemplates "reasonable" viewpoint discrimination by school administrators in the context of school-sponsored speech is anything but clear. On the one hand, much of *Hazelwood*'s discussion of the proper role of school officials in making curricular judgments seems to suggest that viewpoint-based judgments would be permissible, and perhaps even desirable, at least under some circumstances. *See, e.g., Hazelwood,* 484 U.S. at 272, 108 S.Ct. 562 ("A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of politi-cal controversy." (internal quotation and citation omitted)). On the other hand, the Court in fact had no occasion to consider whether such circumstances *were* present in the case before it: The high school apparently had conceded that only viewpoint neutral restrictions on access to the school newspaper would have passed constitutional muster. *See id.* at 287 n. 3, 108 S.Ct. 562 (Brennan, *J.,* dissenting).

We also find it significant that *Hazelwood* analyzed the nature of the expressive forum created by the high school newspaper at issue in the case, and relied, in that analysis, on its prior decisions in *Cornelius* and *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). *See Hazelwood,* 484 U.S. at 267–70, 108 S.Ct. 562. Both *Cornelius,* in the context of a non-public forum, and *Perry,* in the context of a limited public forum, stated that government speech regulations that discriminated among viewpoints were prohibited under the First Amendment. *See Cornelius,* 473 U.S. at 811, 105 S.Ct. 3439 (stating that "[t]he existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation

---

**9.** The First and Tenth Circuits have expressly held that educators may make viewpoint-based decisions about school-sponsored speech. *See Ward v. Hickey,* 996 F.2d 448, 452 (1st Cir.1993); *Fleming v. Jefferson County Sch. Dist. R–1,* 298 F.3d 918, 926–28 (10th Cir.2002). The Ninth Circuit and Eleventh Circuits have, instead, decided that *Hazelwood* did not alter the general requirement of viewpoint neutrality in non-public fora. *See Planned Parenthood of S. Nevada, Inc. v. Clark County Sch. Dist.,* 941 F.2d 817, 829 (9th Cir.1991) (en banc) (applying, without discussion, *Cornelius* viewpoint neutrality standard to a nonpublic school forum); *Searcey v. Harris,* 888 F.2d 1314, 1319 n. 7 (11th Cir.1989); *see also Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003, 1010–11 (9th Cir.2000) (noting that "despite the absence of express 'viewpoint neutrality' discussion anywhere in *Hazelwood,* the *Planned Parenthood* court in-corporated 'viewpoint neutrality' analysis into nonpublic forum, school-sponsored speech cases in our Circuit," but deciding, ultimately, that *Hazelwood* did not supply the appropriate standard for the issue before it). A panel of the Third Circuit held that a viewpoint restriction "may reasonably be related to legitimate pedagogical concerns" and therefore constitutional, but on a rehearing en banc, the circuit was equally-divided on the question. *See C.H. ex rel. Z.H. v. Oliva,* 195 F.3d 167, 172 (3d Cir.1999), *vacated and reh'g en banc granted by* 197 F.3d 63 (3d Cir.1999), *on reh'g en banc* 226 F.3d 198 (3d Cir.2000) (affirming the district court judgment regarding one expressive act without explication and deciding the remaining expressive issue on procedural grounds, thereby obviating the need to reach the viewpoint neutrality question).

that is in reality a facade for viewpoint-based discrimination," and remanding the case for a determination of whether the government's otherwise-reasonable speech restrictions were impermissibly viewpoint discriminatory). Yet *Hazelwood* never distinguished the powerful holdings of these cases with respect to viewpoint neutrality, or, for that matter, even *mentioned*, explicitly, the question of viewpoint neutrality. And we are reluctant to conclude that the Supreme Court would, without discussion and indeed totally *sub silentio*, overrule *Cornelius* and *Perry*—even in the limited context of school-sponsored student speech.[10]

■ For the foregoing reasons, we decline The District's invitation to depart, without clear direction from the Supreme Court, from what has, to date, remained a core facet of First Amendment protection. *Compare Searcey v. Harris*, 888 F.2d 1314, 1325 (11th Cir.1989) ("Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral."). Thus, on the facts and the legal arguments as they are currently developed before us, we conclude that a manifestly viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, *even if* reasonably related to legitimate pedagogical interests.

■ In remanding the free speech claim to the district court for further consideration of the viewpoint neutrality issue, however, we do not *foreclose* the possibility that certain aspects of the record might be developed in such a manner as to disclose a state interest so overriding as to justify, under the First Amendment, The District's potentially viewpoint discriminatory censorship. For example, The District has proffered its interest in avoiding the perception of religious *endorsement* as a rationale for not including Antonio's full poster in the environmental assembly. On the facts before us we cannot say, at this time, as a matter of law that The District's concern in this regard would justify viewpoint discrimination. *Compare Widmar v. Vincent*, 454 U.S. 263, 270–71, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (concluding that avoidance of a violation of the Establishment Clause could constitute a compelling state interest to justify a content-based restriction in a limited public forum), *with Locke v. Davey*, 540 U.S. 712, 730 n. 2, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (Scalia, *J.*, dissenting) ("[A] State has a compelling interest in not committing *actual* Establishment Clause violations. We have never inferred from this principle that a State has a constitutionally sufficient interest in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns." (internal citation omitted)), *and Good News Club*, 533 U.S. at 112–19, 121 S.Ct. 2093 (observing that, since the Court had never upheld viewpoint discrimination on the ground that it was necessary to prevent an Establishment Clause violation, it remained "not clear" whether the Establishment Clause constituted a constitutionally-viable justification for such discrimination).

We think it prudent to leave it to the district court, in the first instance, to ascertain whether The District's actions were necessary to avoid an Establishment Clause violation, and if so, whether avoidance of that violation was a sufficiently compelling state interest as to justify viewpoint discrimination by The District.[11]

---

**10.** The Court's subsequent citation to *Hazelwood*, in dicta, for the proposition that viewpoint-based speech restrictions may be appropriate where the State itself speaks, *see*

*Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510, does not persuade us to the contrary.

**11.** Just as it may be that viewpoint discrimination with respect to religion is justified in a

## C. Establishment Clause Claim

The Pecks also appeal the district court's dismissal of their Establishment Clause claim against The District. They argue that triable issues exist on the question of whether The District's censorship of Antonio's poster had the primary effect of inhibiting Antonio's religious expression, exhibiting hostility toward Christianity, and resulting in The District's excessive religious entanglement.

In this Circuit, as the parties appear to agree, the Supreme Court's *Lemon* test continues to govern our analysis of Establishment Clause claims. *See, e.g., DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 405–06 (2d Cir.2001) (stating that "[w]e continue in this Circuit to apply the general test first set forth by the Supreme Court in [*Lemon*]," and noting that despite criticism of the test the Supreme Court had declined to overrule it); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 75 (2d Cir.2001) (applying the *Lemon* test to a challenge to a school district's Earth Day celebration). When presented with an Establishment Clause challenge to a state practice,

> we are required to ask [(1)] whether the government acted with the purpose of advancing or inhibiting religion and [(2)] whether the aid has the effect of advancing or inhibiting religion. We employ three primary criteria to answer the latter question: whether the action

or program results in governmental indoctrination; defines its recipients by reference to religion; or creates an excessive entanglement.

*DeStefano*, 247 F.3d at 406 (internal quotation marks, alterations, and citations omitted).

Applying the above factors to the undisputed facts, we conclude that the district court properly dismissed the Pecks' Establishment Clause claim. We see nothing in the record to suggest that The District acted, as the Pecks contend, with the purpose of inhibiting religion. As discussed above, two of the three rationales given by the district court for not displaying Antonio's full poster—the concern that the poster was both not responsive to the assignment and that it was not Antonio's work—were wholly secular. While the third stated reason, avoidance of the perception of religious endorsement, is no doubt involved with religion, such a goal does not bespeak an intent to inhibit religion itself. We note as well that the partial censorship of Antonio's poster, resulting in the concealment of the robed figure but the display of a church with a cross, strongly cuts against the Pecks' bare allegation that The District's actions were intended to demonstrate hostility toward religion. In short, no triable issue exists on this score.

---

school context by a compelling state interest, such as avoiding a seeming Establishment Clause violation, so viewpoint discrimination, taking into account the particularities of a school context and the vulnerability of young children in it, might be justified with respect to other forms of speech. In other words, a holding that the requirement of viewpoint neutrality perdures in a school context even after *Hazelwood* does not mean that the particular requirements of a school context and of the age of the children involved in such a context may not create a compelling state interest. That is, even so powerful a rule as

that there must be viewpoint neutrality is subject to being trumped by the existence of a compelling state interest. And what is a compelling state interest is certainly informed by the fact of a school context and the presence of minor children. In gauging whether there is a compelling state interest though, courts must be exceedingly careful to be sure that the asserted compelling state interest *is* directly concerned with the state's desire to protect the children in the school and is not motivated by the wish to suppress speech the school and the state do not like.

As to the "primary effect" inquiry, the Pecks argue that the decision to censor the robed figure on Antonio's poster excessively entangled The District in religious matters. We think it clear, however, that whatever limited religious discernment was entailed in the decision to censor the robed figure (which both parties identify in their briefs as "Jesus"), The District's resulting "entanglement" in religion was *de minimis* at most. *Cf. Lynch v. Donnelly,* 465 U.S. 668, 683, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) ("We can assume, *arguendo,* that the [city's conduct] advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action .... [N]ot every law that confers an indirect, remote, or incidental benefit upon religion is, for that reason alone, constitutionally invalid." (internal quotation marks and alterations omitted)); *Marchi v. Bd. of Cooperative Educ. Serv. of Albany,* 173 F.3d 469, 476 (2d Cir.1999) ("[W]hen courts adjudicate claims that some governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance.").

We also reject the suggestion by the Pecks that, because Antonio was prevented from expressing his religious perspective in the context of the kindergarten poster project, The District's decision had the impermissible "effect" of inhibiting religion. Whatever merit this claim might have if the Pecks were still pursuing their Free Exercise claim, it has no bearing on the *Lemon* test's inquiry into whether a *reasonable* observer would understand the government action in question to advance or inhibit religion. *See Altman,* 245 F.3d at 75.

For all of the foregoing reasons, we concur with the judgment of the district court that no triable issues exist with respect to The District's alleged Establishment Clause violation. Accordingly, that claim was properly dismissed.

### III. Conclusion

The district court's dismissal of the Pecks' free speech claim is VACATED, and its dismissal of the Establishment Clause claim is AFFIRMED. The case is REMANDED for further proceedings consistent with this opinion.